IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


MANDY BURGHY,                           :

          Plaintiff,                    :
                                                Case No. 3:08cv86
          vs.                           :
                                        JUDGE WALTER HERBERT RICE
DAYTON RACQUET CLUB, INC.,              :
 et al.,

          Defendants.                   :

---

DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN
PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(DOC. #18); CONFERENCE CALL SET

---

     This action arises out of events that occurred between January 15 and

January 23, 2008.  Plaintiff, Mandy Burghy, was an employee of the Dayton

Racquet Club ("Dayton Racquet Club"), an athletic and social club situated at the

top of the Kettering Tower in downtown Dayton, Ohio.  Dayton Racquet Club is a

subsidiary of ClubCorp, a national corporation headquartered in Dallas, Texas,

which owns and operates athletic clubs, country clubs and resorts throughout the

United States.

     After transferring from a different ClubCorp property in Columbus Ohio,

Burghy began working in the accounting department of the Dayton Racquet Club,

and remained there for seven years.[1]  Doc. #1 at 2; Doc. #17 at 22.  (Complaint and Plaintiff's Deposition, respectively).  As an Accounting Assistant for Dayton Racquet Club, Burghy handled tasks related to accounts receivable, accounts payable, billing, bill reconciliation, check processing, credit card payment processing and other duties.  Doc. #17 at 27-29.  The Dayton Racquet Club requires all employees engaged in various "critical positions" to occasionally submit to certain investigations of their personal or criminal history in order to ensure that they remain eligible for employment.  Id. at Ex. C (Disclosure and Release Form).  For example, employees who drive vehicles as part of a job must submit to driving records checks, known as motor vehicle reports or "MVRs".  Id.  Burghy worked in the accounting department, and all accounting employees were required to submit to a credit history check as part of their continued employment.  Id.  On January 15, 2008, Plaintiff signed a disclosure form purporting to authorize the Dayton Racquet Club to obtain her credit history report as part of her continued employment in the accounting department.  Id. at 23.  She had previously signed a similar form on July 7, 2004, after which her employment had continued without incident.  Doc. #17 at 34.

The next day, January 16, 2008, Burghy was called in for a meeting with Kevin Round, the general manager at Dayton Racquet Club, and Bruce Stricker, her

_____

[1]Since this case comes before the Court on the Defendant's Motion for Summary Judgment, the Court sets forth the relevant facts and circumstances in the manner most favorable to the Plaintiff, the party against whom the motion is directed.  Servo Kinetics, Inc. v. Tokyo Precision Instruments, 475 F.3d 783, 790 (6th Cir. 2007).

immediate supervisor in the accounting department. Id. at 36-37. The meeting was called to discuss the results of the credit check that had been performed and how it might affect Burghy's employment going forward. Id. The credit check had revealed various adverse items, with the cumulative result being that Burghy apparently did not meet the minimum criteria that Dayton Racquet Club had set for her position. Id. at 50-5. Although exactly what transpired during the meeting is a matter of disagreement between the parties, it is undisputed that, at the conclusion of the meeting, Burghy was told to go home, and that she would never again report for work as an accounting assistant at the Dayton Racquet Club. Also on January 16, Dayton Racquet Club generated a letter that was mailed to Burghy, and which she received shortly thereafter. Id. at Ex. D. The letter indicated that the information in Burghy's credit report might, or might not, affect her employment status going forward, and that no final decision had yet been reached. Id. Enclosed with the letter was a copy of the report on her credit background that had been discussed in the meeting that same day. Id. On January 23, 2008, Dayton Racquet Club sent a second letter to Burghy, indicating that her services were no longer needed and that she was terminated. The letter indicated that information contained in the recent credit report contributed to the decision to terminate her. Id. at Ex. E. Plaintiff has asserted several claims against her former employer, arising out of this sequence of events.

The Fair Credit Reporting Act, 15 U.S.C. §§ 1681, et seq, ("FCRA" or "Act"), which gives rise to the majority of Plaintiff's claims, is a federal law enacted to set standards for the reporting of credit information and to protect consumers from inaccurate disclosures of credit information and other abuses. Congress's stated purpose in enacting the FCRA was "[t]o safeguard the consumer in connection with the utilization of credit." Pub. L. No. 90-321, 82 Stat. 146 (2003). Congress effectuated this goal by limiting the release of consumer credit reports to specific permissible purposes set forth in 15 U.S.C. § 1681b(a). It is permissible for an employer to procure a credit report for employment purposes. Id.

The "consumer reports" with which the FCRA is primarily concerned are defined as "any written, oral or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness [creditworthiness], credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living . . . ." 15 U.S.C. § 1681(a)(d)(1) (brackets in original). These reports are gathered and distributed by "consumer reporting agencies," which § 1681a(f) defines as: "any person which, for monetary fees . . . regularly engages in . . . the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties." Consumer reports may address topics broader than an individual's credit history; for example, consumer reports may uncover criminal records. Herein, however, both parties are concerned only

with the credit information contained in Burghy's report of January 15, and the terms "consumer report" and "credit report" are used interchangeably by the Court.

On March 14, 2008, Plaintiff filed her Complaint against Dayton Racquet Club and its parent company, ClubCorp (collectively, "Defendants"), asserting five causes of action against both, to wit: (1) Failing to provide a clear and conspicuous disclosure that Plaintiff's credit report would be obtained for employment purposes, in violation of 15 U.S.C. § 1681b(b)(2)(A); (2) Taking adverse action against Plaintiff before providing her with a copy of her credit report, in violation of 15 U.S.C. § 1681b(b)(3)(A); (3) Obtaining her credit report under false pretenses, in violation of 15 U.S.C. § 1681b(b)(1)(A); (4) intentional infliction of emotional distress, and (5) negligence. The first three causes of action arise under the FCRA, the latter two are state law claims over which the Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a). On April 10, 2008, Defendants filed their Motion for Summary Judgment, directed to all of Plaintiff's claims, to which Plaintiff has filed a Response.[2] Doc. #18; Doc. #20.

---

[2]Defendants point out, in their Reply, that Plaintiff's Response appears to have been filed one day late; it was due on May 4, 2009, and Plaintiff actually filed it on May 5, 2009. Doc. #21 at 1. Defendants contend that Plaintiff failed to comply with Fed. R. Civ. P. 6(b), by not seeking an extension of time to file her memorandum, and that her Response is not properly before the Court and should be disregarded. However, because the delay was brief and caused no prejudice to Defendants, the Court considers Plaintiff's Response in full.

As a means of analysis, the Court will first set out the standard of review

applicable to all motions for summary judgment, thereafter addressing the

arguments of the parties in light of that standard and in the same order as above.


I. Summary Judgment Standards

Summary judgment must be entered "against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." Celotex Corp.

v. Catrett, 477 U.S. 317, 322 (1986). Of course, the moving party:

> always bears the initial responsibility of informing the district court of
> the basis for its motion, and identifying those portions of "the
> pleadings, depositions, answers to interrogatories, and admissions on
> file, together with the affidavits, if any," which it believes
> demonstrate the absence of a genuine issue of material fact.

Id. at 323. See also Boretti v. Wiscomb, 930 F.2d 1150, 1156 (6th Cir. 1991)

(The moving party has the "burden of showing that the pleadings, depositions,

answers to interrogatories, admissions and affidavits in the record, construed

favorably to the nonmoving party, do not raise a genuine issue of material fact for

trial.") (quoting Gutierrez v. Lynch, 826 F.2d 1534, 1536 (6th Cir. 1987)). The

burden then shifts to the nonmoving party who "must set forth specific facts

showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). Thus, "[o]nce the

moving party has met its initial burden, the nonmoving party must present

evidence that creates a genuine issue of material fact making it necessary to

resolve the difference at trial." Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d 1241, 1245 (6th Cir. 1995). Read together, Liberty Lobby and Celotex stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law. Fed.R.Civ.P. 50). Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478 (6th Cir. 1989).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). See also Michigan Protection and Advocacy Service, Inc. v. Babin, 18 F.3d 337, 341 (6th Cir. 1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff."). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. Celotex Corp., 477 U.S. at 324. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are … 'genuine factual issues that properly can

be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" Hancock v. Dodson, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all *reasonable* inferences in the favor of that party. Anderson, 477 U.S. at 255 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, Federal Practice and Procedure, § 2726. In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." Interroyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), cert. denied, 494 U.S. 1091 (1990). See also L.S. Heath & Son, Inc. v. AT&T Information Systems, Inc., 9 F.3d 561 (7th Cir. 1993); Skotak v. Tenneco Resins, Inc., 953 F.2d 909, 915 n. 7 (5th Cir.), cert. denied, 506 U.S. 832 (1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment ...."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on

file, together with any affidavits submitted, specifically called to its attention by the parties.

## II. Violation of 15 U.S.C. § 1681b(b)(2)(A): Failure to Provide Clear and Conspicuous Disclosure that a Consumer Report may be Obtained for Employment Purposes

One protection the FCRA affords consumers is its requirement that employers seeking to obtain a consumer report on a current or potential employee disclose that such a report "may be obtained for employment purposes."  Section 1681b(b)(2)(A) provides as follows:

> A person may not procure a consumer report, or cause a consumer report to be procured, for employment purposes with respect to any consumer, unless:
> (i) A *clear and conspicuous* disclosure has been made in writing to the consumer at any time before the report is procured or caused to be procured, in a document that consists solely of the disclosure, that a consumer report may be obtained for employment purposes[.]

(emphasis added).  The FCRA defines "employment purposes" as those relating to "[evaluating] a consumer for employment, promotion, reassignment or retention as an employee."  15 U.S.C. § 1681a(h).  Although Plaintiff acknowledges that, on January 15, 2008, she signed a disclosure form purporting to authorize Dayton Racquet Club to obtain her consumer report, she contends that the form did not clearly and conspicuously disclose that it could be used for employment purposes.

Although § 1681b(b)(2)(A) and several other provisions of the FCRA require that the consumer receive a "clear and conspicuous" disclosure of certain

information, the statute, unfortunately, does not define "clear and conspicuous" as it appears in §1681b(b)(2)(A) or in any other provision.  Furthermore, although the Act was first passed in 1970, there remains a dearth of case law interpreting this particular requirement.  See Sampson v. Western Sierra Acceptance Corp., 2003 U.S. Dist. LEXIS 13429 at *3 (N.D. Ill. 2003) (commenting on the lack of case law defining or interpreting "clear and conspicuous" in the FCRA).  The Sixth Circuit has not addressed this issue directly, but other Circuits have looked for guidance from decisions under the Uniform Commercial Code ("UCC") and the Truth in Lending Act ("TILA"), both of which invoke the same "clear and conspicuous" language.  The Court finds their reasons for doing so persuasive:

> [W]e believe it is appropriate to draw upon the wealth of UCC and TILA case law in determining the meaning of "clear and conspicuous" under the FCRA. The UCC defines conspicuous as "so written, displayed, or presented that a reasonable person against [whom] it is to operate ought to have noticed it." U.C.C. § 1-201(10).  When evaluating a disclaimer of warranty against this standard, we have looked to how many times a customer was made aware of the notice, whether the notice was on the front or back of the document in question, whether the language of the notice was emphasized in some way (such as by bolding the text or by employing all capitals) and whether the notice was set off from the rest of the document so as to draw attention to it.

Cole v. U.S. Capital, 389 F.3d 719, 730-31 (7th Cir. 2004) (citations omitted).

See also Stevenson v. TWR INC., 987 F.2d 288, 296 (5th Cir. 1993) ("While there has been little litigation over the meaning of the phrase 'clear and conspicuous' in FCRA, the phrase is common in other federal and state commercial regulatory statutes, [such as TILA] . . . .  The term 'conspicuous' has been construed most frequently with the Uniform Commercial Code.").

Plaintiff does not argue that the language of the disclosure was poorly drafted, overly technical, or otherwise incomprehensible. Rather, Plaintiff's argument is that "[a] reasonable person would not have noticed that a consumer report would be obtained for employment purposes." Doc #20 at 7. Thus, the issue the Court must address is whether or not the disclosure was sufficiently conspicuous, not whether it was clear.[3] Tucker v. New Rogers Pontiac, Inc., 2003 U.S. Dist. LEXIS 25346 at **11-12 (N.D. Ill 2003) ("Plaintiffs here do not attack the clarity of the disclosures . . . . The court therefore focuses on whether, viewed in the light most favorable to Plaintiffs, the disclosures in Exhibit A are sufficiently 'conspicuous' to an ordinary consumer[.]") The Court determines conspicuousness as a matter of law. It does so, "not because judges are experts at graphic design, but because subjecting conspicuousness to fact-finding would introduce too much uncertainty into the drafting process." In re Bassett, 285 F. 3d 882, 885 (9th Cir. 2002), cert. denied, 537 U.S. 1002 (2002), (determining "conspicuousness" as a matter of law under the TILA statute). See also Smith v. Check-N-Go of Illinois, 200 F.3d 511 (7th Cir. 1999) (Easterbrook, C.J.) (holding that "conspicuousness"

_____

[3]Plaintiff's Response contains one sentence that arguably regards clarity: "Lastly, neither disclosure specifically states that a credit report may be used for employment purposes." Doc. #20 at 7 (referring both to the disclosure at issue in this case and an earlier, similar, document Plaintiff signed). Plaintiff offers no analysis that would suggest the FCRA mandates use of the exact phrase "used for employment purposes" in referring to consumer reports. The language actually employed throughout the form, e.g., "I understand the following background checks are the current minimum requirements . . . if applying for or already working in certain critical positions . . ." is not ambiguous as to the disclosure's applicability in the employment context. Doc. #17 at Ex. C.

must be treated as a matter of law under the TILA statute); <u>U.S. Fibres, Inc., v. Proctor & Schwartz, Inc.</u>, 509 F.2d 1043, 1047 (6th Cir. 1975) ("Conspicuousness is a question of law for the court.") (citing the UCC and applying Pennsylvania law);[4] <u>Sampson</u>, 2003 U.S. Dist. LEXIS 13429 at *12 (finding an offending disclosure inconspicuous as a matter of law under the FCRA); <u>Barrett v. Bank One, N.A.</u>, 511 F. Supp. 2d 836, 838 (E.D. Ky. 2007) ("Plaintiffs claim that . . . they did not receive 'clear and conspicuous' notice of their right to cancel, as required by . . . [TILA].  This is a question of law."); <u>Babcock & Wilcox Co. v. Hitachi Am., Ltd.</u>, 406 F.Supp. 2d 819, 834 (N.D. Ohio 2005) ("the issue of conspicuousness is a matter of law and thus is for decision by the court.") (applying the UCC) (citations and internal quotation marks omitted).

 Plaintiff's argument begins by citing the definition of conspicuousness under Ohio's version of the UCC:

---

[4]The Court's research has not revealed any Sixth Circuit case that directly addresses the "conspicuous" disclosure requirement in a federal statute such as the FCRA.  Thus, it is not certain that its declaration that "conspicuousness is a question of law for the court" in <u>U.S. Fibres</u> is applicable outside the specific state-law scope of that case.  However, it has also held that "[t]he interpretation and construction of a written contract are matters of law within the competence of the Court of Appeals to review and do not come under the clearly erroneous rule [applicable to factual determinations of the trial court]."  <u>Cordovan Assoc., Inc. v. Dayton Rubber Co.</u>, 290 F.2d 858, 860 (6th Cir. 1961).  An odd schism would present itself if contracts were to be reviewed as a matter of law, but other written instruments containing the same terminology–such as the disclosure in the present case–were submitted to the jury for fact-finding.  Furthermore, while the UCC does not represent the governing law in this case, as it would in a state-law contract dispute, it remains persuasive authority.  <u>See</u> <u>Cole</u> and <u>Stevenson</u>, <u>supra</u>.  Thus, the Court must give some consideration to the UCC's explicit proclamation that: "Whether a term or clause is 'conspicuous' is for decision by the court."  UCC §-201(10); O.R.C. § 1301.01(J).

A term or clause is "conspicuous" when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: NONNEGOTIABLE BILL OF LADING) is "conspicuous." Language in the body of a form is "conspicuous" if it is in larger or other contrasting type or color. In a telegram, any stated term is "conspicuous." Whether a term or clause is "conspicuous" is for decision by the court.

O.R.C. § 1301.01(J).[5] She purports to identify two deficiencies in the disclosure form, to wit: that it uses the same style of text throughout, without contrasting any portion with text of a different size or color, and that it "buries" the relevant disclosure in a "laundry list" of other information that the form authorizes the Defendants to obtain.[6] Doc. #20 at 6–7. The Court addresses these arguments in the same order.

Although the Plaintiff is correct that the disclosure does not track the section of the UCC she has quoted, O.R.C. § 1301.01(J), at least insofar as it is not offset by different type size or color, the present inquiry is not aided by a talismanic recitation of signals that the UCC regards as conspicuous. These are sufficient, but not necessary, as the Sixth Circuit has explained:

---

[5]Ohio's adoption of the UCC is essentially identical to the American Law Institute version, with only minor changes in punctuation and capitalization.

[6]Plaintiff's Response reads as follows, in describing the deficiencies in Defendants' form: "The entire disclosure is written in the same typeface and covers a laundry list of different information Defendants could obtain about Plaintiff. The information about consumer reports is not larger nor does it contain contrasting type color. Additionally, the information about consumer reports is buried in a list of different types of information that Defendants may obtain." Doc. #20 at 7. The suggestion, in the first sentence, that the disclosure "covers a laundry list of information" is sufficiently similar to the description in the last sentence that the "information about consumer reports is buried" in a list of other types of information, that the Court groups these considerations together. So too with Plaintiffs arguments as to type size and color.

> We do not read the cases as holding the [] rule to be that there can be no disclaimer as a matter of law if type of the same color and size is used in the text . . . . It is significant that the official UCC comments under Section 1-201(10) state– "Conspicuous.  New.  This is intended to indicate *some* of the methods of making a term attention-calling. *But the test is whether attention can reasonably be expected to be called to it.*"

U.S. Fibres, 509 F.2d at 1047 (quoting the UCC and interpreting Pennsylvania law)

(emphasis added).  Thus, the Court cannot simply recite the UCC as Plaintiff

quotes it and measure how closely the disclosure conforms or diverges.  Rather:

> there is not one aspect of a notice that necessarily will render it "clear and conspicuous" for purposes of the FCRA.  We must consider the location of the notice within the document, the type size used within the notice as well as the type size in comparison to the rest of the document.  We also must consider whether the notice is set off in any other way–spacing, font style, all capitals, etc.  In short, there must be something about the way that the notice is presented in the document such that the consumer's attention will be drawn to it.

Cole, 389 F.3d at 731.

An examination of the disclosure form indicates that it is conspicuous as to

the fact that a consumer report could be used for employment purposes.  In the

center of the only page of the document are three bullet points that present the

background check requirements for various positions at Dayton Racquet Club.  The

third bullet point provides as follows:

> *Accounting/financial*, General Manager, General Manager in Training, and certain Society and Owner's Club *positions*, as well as solo independent contractors performing similar functions/services, *require credit history checks*, and I understand credit-reporting agencies, credit/bankruptcy litigation, and credit reports may also be included.

Doc. # 17 Ex. C (emphases added).  The bullet point directly above states that all

positions with Dayton Racquet Club require criminal background checks.  Id.  The

first bullet, which indicates that jobs that involve driving require "MVR" checks (Motor Vehicle Reports), is the only one that does not apply to Plaintiff. Id. Although the words that comprise the bullet points are in the same color and size as the rest of the document, the question is whether there is "something about the way that the notice is presented . . . such that the consumer's attention will be drawn to it." Cole, 389 F.3d at 731. The bullet points serve exactly this function. Because nothing else on the page stands out (as the Plaintiff indicates, the same type size and color appear throughout), the reader's eyes are instantly drawn to the three bullet points in the center of the page. The relevant test, whether "attention can reasonably be expected to be called to [the disclosure]," U.S. Fibres, 509 F.2d at 1047, does not depend upon the particular mechanism that is employed to attract the reader's attention. Thus, there is nothing deficient in Dayton Racquet Club's decision to make the relevant portions of its form conspicuous through means other than altering text size or color, given that the disclosure herein, that certain background checks are associated with certain jobs (and thus, used for "employment purposes"), is set off from the remaining text in an attention-calling manner. The paragraph immediately preceding the bullet points consists of one sentence which indicates that the bulleted background checks are "minimum requirements" for employment at Dayton Racquet Club. While this sentence is not offset from the rest of the document itself, attention is drawn to it because it immediately precedes the bulleted disclosures and, in fact, refers to them. Furthermore, though the preceding paragraph certainly adds clarity to the matter,

reading the bullet points alone indicates that the credit, criminal, or MVR background checks discussed therein are associated with job functions at the Dayton Racquet Club. See Doc. #17 Ex. C. ("*All* positions . . . *require* criminal checks; *Accounting*/*Financial* . . . positions . . . *require* credit history checks . . . .") (emphasis added). It is unclear whether Plaintiff is arguing that either different colors or different type sizes must be used, or if she believes both are necessary. Regardless, what the Act demands is conspicuous disclosure, not contrasting type size or color. One can always argue that a disclosure could have been *more* conspicuous, by using even larger type, by employing extremely bright (rather than muted) colors, and so forth. Here, the bulleted points call attention to specific information, rendering the disclosure conspicuous. Anyone who reads the bullet points will realize the background checks mentioned are for employment purposes.

Plaintiff's other argument is that "the information about consumer reports is buried in a list of different types of information that Defendants may obtain." Doc. #20 at 7. This is the only statement that Plaintiff offers to explain this contention, and much is left unclear. Although there is one bullet point in the group of three that discusses job functions requiring driving and, thus, did not apply to Plaintiff, the presence of one inapplicable bullet does not render the other two inconspicuous. To hold otherwise would require employers to design a different form for each and every job function in which one could be employed at a given corporation.

Plaintiff may be arguing, instead, that the paragraphs above and below the bullets distract attention from them, but her argument specifically refers to "the information about consumer reports" being buried. Id. The problem with this characterization is that the paragraphs, as well as the bullet points, and indeed *all* parts of the form discuss consumer reports. The first paragraph indicates that the employee is authorizing the employer to procure a consumer report ("I authorize Dayton Racquet Club . . . to retrieve information . . . relating to my past activities"), while the paragraph below the bullet points clarifies that the authorizing consumer has read the disclosure and knows what happens next ("I understand that a consumer report may be prepared summarizing this information. If my prior employers, clients, and/or references are contacted, the report may include information obtained through personal interviews regarding my character, general reputation . . . and/or mode of living."). Doc. #17 Ex. C. Both of these paragraphs are essential to understand the disclosure: The former authorizes the employer to procure the report, while the latter indicates that the consumer has contemplated the substance of that authorization. After all, one cannot meaningfully authorize her employer to take an action if she does not grasp what that action entails.

The FCRA does demand that the revelation that a consumer report may be obtained for employment purposes be made "in a document that consists solely of [that] disclosure." 15 U.S.C. § 1681b(b)(2)(A)(i). Thus, one reading of Plaintiff's argument might be that including the explanatory language of the other paragraphs

alongside the bullet points means that the document does not consist *solely* of the disclosure that a consumer report may be obtained for employment purposes. This argument is also unpersuasive, if it is, in fact, what Plaintiff means to convey. The Act specifically states that the language *authorizing* the employer to obtain a consumer report (the first and second paragraphs) may be included alongside the language *disclosing* that such a report may be used for employment purposes (the bullet points). 15 U.S.C. § 1681b(b)(2)(A)(ii) ("[an employer may obtain a consumer report if] the consumer has authorized in writing (*which authorization may be made on the document referred to in clause (i)*) the procurement of the report by that person.") (emphasis added). Including the explanatory language alongside the disclosure language is logical, given their relationship, and the Court cannot conclude that the presence of the former renders the latter inconspicuous. See Cafarelli v. Yancy, 226 F.3d 492, 499 (6th Cir. 2005) ("[we must interpret] all statutes . . . 'as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous.'") (quoting Lake Cumberland Trust, Inc. v. EPA, 954 F.2d 1218, 1222 (6th Cir. 1992)).

Indeed, the length of the document weighs against the Plaintiff's argument. Since the statute mandates the pertinent information be presented "in a document that consists solely of the disclosure," the FCRA consumer avoids the state of affairs (lamentably common in an environment of increasing transactional complexity) in which she must decipher a seemingly interminable document in order to locate all of the clauses that might operate against her. The brevity of the

disclosure suggests that it was conspicuous.  See Marion Audiovisual Productions, Inc., v. Eastman Kodak Co., 487 F. Supp. 371, 375 (N.D. Ohio 1980) ("The Court also finds significant the fact that the aforesaid notice was one of the few writings on the film label.  It is not as though the situation existed where a limitation had been included in an extensive document.") (finding conspicuous an octagonal label containing limiting language that was affixed to a package of film).  Although the Court cannot agree with Defendants' argument that *any* disclosure in a one-page document is, by definition, conspicuous (it could still be printed in illegibly small type or obscured by overly distracting information), herein, in conjunction with the factors already outlined, the concise nature of the document weighs in favor of a finding of conspicuous disclosure.

In sum, the disclosure presented to Plaintiff in this case is unlike those that have been found inconspicuous under the FCRA and similar laws.  Herein, the disclosure was on the front side of a one-page document, and not concealed on the back, TWR Inc., 987 F.2d at 296 ("Even if Stevenson read the back of his first credit report, there was nothing to draw his attention particularly to the statutory notice."); it employed reasonably sized type throughout, Cole, 389 F.3d at 731 ("The paragraph consists of nine lines of text that occupy, generously speaking, one inch of space.  The font size is no larger than six-point and is the smallest font on the page by several sizes."); it used bullet points to call attention to the disclosures, Id. ("The notice is not distinct in any way (except in how small it is)–either through color, emphasis or font style."), and, indeed, it appears that Plaintiff was actually aware of the employment-related function of the consumer

reports,[7] <u>Eastman Kodak</u>, 487 F. Supp. at 375 ("Furthermore, it is clear that plaintiff was aware of the limiting language in question when it purchased the film from the defendant, as the provision was according to the mores and business practices of the industry."). Plaintiff has not cited any cases in which a similar disclosure was found to be inconspicuous under the FCRA (or any analogous federal statute), and the Court is unpersuaded by the purported deficiencies that Plaintiff attempts to argue.

Accordingly, Defendants' Motion for Summary Judgment as to Plaintiff's claim under § 1681b(b)(2)(A) is sustained.

### III. Violation of 15 U.S.C. § 1681b(b)(3)(A): Failure to Provide Plaintiff a Copy of her Consumer Report Before Taking Adverse Action

Plaintiff argues that Defendants violated 15 U.S.C. § 1681b(b)(3)(A), which provides that:

> [I]n using a consumer report for employment purposes, before taking any adverse action based in whole or in part on the report, the person intending to take such adverse action shall provide to the consumer to whom the report relates:
> (i) a copy of the report; and
> (ii) a description in writing of the rights of the consumer.

---

[7]Plaintiff's deposition, Doc. #17 at page 17, reveals this line of questioning:
   Q: And did you understand that Dayton Racquet Club was requiring you to submit to a credit check in order to be eligible for the accounting position?
   A: I was aware that they were doing a credit check. I wasn't aware my job was pretty much on the line for it. Because, I mean, you know, I had done one before and nothing came up and the results were probably pretty much the same.
   Q: But you were aware they were doing it in connection with you being in the accounting position job?
   A: Yes.

It is undisputed that Dayton Racquet Club provided Burghy with a copy of her credit report and a description of her rights. The only issue is whether it did so *before* taking adverse action against her.[8] The temporal chain of events between January 15 and January 23 is at the core of this inquiry.

Both parties agree that on January 15, Plaintiff signed the disclosure form purporting to authorize Dayton Racquet Club to retrieve her credit report, and that on January 16, Plaintiff was summoned at work for a meeting with her supervisors, Kevin Round and Bruce Stricker. A copy of Plaintiff's credit report and an accompanying letter were generated on January 16, mailed, and Plaintiff received them soon after. Doc. #17 at 43 ("I received it that Friday, I think it was. I don't know what day the 16th was. I think it might have been a Tuesday, and I think I received this Friday."). The letter that arrived on or about Friday, January 18,[9] contained the following paragraph regarding the potential effect of Plaintiff's consumer report on her continued employment:

---

[8]In her response, Plaintiff highlights the catch-all portion of the statute's definition of adverse action: "Pursuant to 15 U.S.C. § 1681a(k)(l)(B)(ii) adverse action is defined as: A denial of employment or *any other decision for employment purposes* that adversely affects any current or prospective employee." Doc. #20 at 7 (emphasis in original). Plaintiff goes on to argue that her termination from her position in the accounting department adversely affected her because "[s]he is 12 to 15 credits from obtaining and [sic] Associates [sic] Degree in Accounting . . . [and] had the goal of establishing a career in accounting." Id. at 8. This argument is unnecessary. It is undisputed that Plaintiff was terminated from her position as an accounting assistant at Dayton Racquet Club. A termination meets the very definition of "adverse action" under the statute because it is a "denial of employment," thus rendering a more searching inquiry into Plaintiff's career goals superfluous.

[9]The Court takes judicial notice of the fact that, in 2008, the Friday in question was the 18th . The 16th was actually a Wednesday.

Although a final decision has not been reached at this time, we wanted to advise you that we have received your report and it may, or may not, affect our decision making process. We will contact you again when our deliberations are complete.

(Doc. #17 Ex. D). On or about January 23, Plaintiff received another letter, this one stating:

We regret to inform you that we no longer require your services at DAYTON RACQUET CLUB INC [sic] Our decision, in part, is the result of reviewing information contained in your personal and/or service file, your consumer report and other criteria.

Id. Defendants contend the sequence and content of these two letters demonstrate that Burghy was not terminated until after she had received a copy of her consumer report and the statement of her rights under the FCRA. As discussed below, Plaintiff contends that she was actually fired earlier, in the meeting with her supervisors and before either letter had arrived. The relevant disagreement can thus be condensed to this question: Was Plaintiff fired on January 23, by letter, or on January 16, in the meeting with her supervisors? If the former, as Dayton Racquet Club argues, then adverse action was undeniably withheld until after Plaintiff was provided with a copy of her credit report. If the latter, as Plaintiff argues, then the adverse action took place before Plaintiff received the copy to which she was entitled under the FCRA. Viewing all evidence in the light most favorable to Plaintiff and drawing all reasonable inferences therefrom, the Court concludes that a genuine issue of material fact exists as to this question.

In their motion, Defendants draw a distinction between "[a]ctually taking an adverse action" and "situations in which the employer has developed a mere intention to take adverse action at some future time *but has not yet actually acted*." Doc. #18 at 8 (emphasis in original). Phrased another way, Defendants' argument seems to be that an employer cannot violate the FCRA by forming a mere intention to take an adverse action; rather, it is only once the adverse action has actually taken place that § 1681b(b)(3)(A) is triggered. Thus, if during the meeting on January 16, Defendants did nothing more than inform Plaintiff that her consumer report revealed unfavorable information that *might* force her from her job, they had not yet taken an adverse action against her and their failure to provide her a copy of her report at that time did not violate the FCRA. The Sixth Circuit has not addressed this contention, but Defendants cite, as persuasive authority, two decisions they believe are on point: <u>Obabueki v. International Business Machines Corp.</u>, 145 F. Supp. 2d 371 (S.D.N.Y. 2001), <u>aff'd</u>, 319 F.3d 87 (2d Cir. N.Y. 2003), <u>cert</u>. <u>denied</u>, 540 U.S. 940 (2003), and <u>In Re: Farmers Insurance Co., Inc. FCRA Litigation</u>, 2007 U.S. Dist. LEXIS 87896 (W.D. OK 2007).

In <u>Obabueki</u>, the district court considered the case of a plaintiff who received a provisional job offer from IBM, and subsequently had that offer revoked when his consumer report revealed an undisclosed criminal conviction. Like Dayton Racquet Club, IBM also sent two letters: The first indicated that it intended to revoke Obabueki's provisional job offer and included a copy of the consumer report that revealed his prior conviction, and the second indicated that the job offer had been

formally revoked.  <u>Obabueki</u>, 145 F. Supp 2d at 377.  A period of five days elapsed between the mailing of the first and second letters.  <u>Id</u>.  The plaintiff argued that IBM took adverse action against him with the first letter, while IBM countered that the first letter merely signaled its intention to withdraw his offer of employment at some later date.  <u>Id</u>. at 392.  Obabueki also pointed to facts that tended to prove that IBM had already completed its internal decision-making process when it sent the first letter, and that no additional inquiry was conducted in the five days leading up to the second letter.  <u>Id</u>. at 391.  The district court agreed with IBM that the adverse action took place when the job offer was actually revoked, and not when the internal decision to revoke the job offer was made or the first letter sent:

> Holding that an employee may suffer adverse action as a result of an internal decision by the employer is akin to finding that a party's summary judgment motion is denied before the Opinion is composed and issued, following discussion between the judge and his law clerk.  The absurdity of such a result is evident.  Moreover, the statute expressly allows for the formation of an intent to take adverse action before complying with Section 1681b(b)(3), as it states that "the person *intending* to take" adverse action must provide the report and description of rights.  After all, how can an employer send an intent letter without having first formed the requisite intent?

<u>Id</u>. at 392 (emphasis in original) (citation omitted).  <u>Farmer's Insurance</u> similarly concluded that a group of insurance customers experienced adverse action only when their rates were actually billed at a higher premium, and not when they received a letter indicating that their insurance rates would increase at some future date.  <u>In Re: Farmers Insurance Co.</u>, LEXIS 87896 at *23–*25.

Obabueki and Farmers Insurance arguably stand for the proposition that an *internal* decision cannot be the measuring point of an adverse action under the FCRA. Rather, an adverse action occurs when the decision is carried out, when it is communicated or actually takes effect, and an actor has until that time to take the necessary steps to comply with the FCRA's requirements. Though plausible, Dayton Racquet Club's reliance on this contention is unavailing, because Burghy's argument as to when adverse action was taken against her is decidedly less abstract. Here, the Plaintiff does not seek to hold her employer liable for an internal decision or preliminary discussions of her employment status. She contends, simply, that she was fired on January 16, in the meeting with her supervisors, and that this adverse action occurred before she received a copy of her credit report or statement of rights under the FCRA.

Plaintiff has asserted, throughout her deposition testimony and Response to the Defendant's Motion for Summary Judgment, that she was told she was fired in the meeting of January 16. See, e.g., Doc. #17 at 36 ("I signed [the disclosure on January 15] because I didn't think anything of it, and that was it. And the next day I lost my job."); Id. at 37 ("[During the meeting Kevin said] [t]hat basically due to the results [that] came back I can no longer do my job.").

In support of its argument, Defendants cite the letter, dated January 16, 2008, which indicated that "no final decision has been made" as well as Plaintiff's deposition testimony. Doc. #17 at Ex. D. Specifically, Defendants point to pages 39 and 40:

> However, Mr. Round also specifically told Plaintiff that he was going to
> further discuss this situation with other individuals at ClubCorp to see if she
> could nevertheless remain in her position.  Plaintiff testified that she left the
> meeting "hoping that [she was] still going to possibly be able to stay in her
> job" and that "everything was kind of left up in the air."

Doc. #21 at 8 (citing Doc. #17 at 39–40).[10]  Consistent with its position that

Plaintiff had not yet been terminated, the Defendants argue, Mr. Round's promise

"that he was going to further discuss this situation with other individuals at

ClubCorp" meant that no final decision to take adverse action had been made, and

that Mr. Round would prevail upon his superiors to allow him to prevent Plaintiff's

termination.  Doc. #18 at 9.

    This interpretation does not provide a full picture of Plaintiff's deposition

testimony, as she characterizes the situation thusly: "[Kevin Round said] [t]hat he

was going to speak with some people in California about me, *about maybe getting*

*my position back*.  Because I was calling to see if they had any luck *trying to get*

*my job back* or anything,"  Doc. #17 at 40, "[a]nd when he went down there, he

found out there was nothing that could be done *about me getting my position*

*back*."  Id. at 39 (emphases added).  Thus, Plaintiff has insisted throughout that

she was told that she was terminated in the meeting on January 16.  Both parties

---

[10]Not only do the Plaintiff and Defendants' characterizations of the meeting differ
sufficiently, so as to create a genuine issue of material fact as to what occurred on
January 16, Defendants' argument also fails to square with its cited authority.
Obabueki and Farmers Insurance, suggest that the "adverse action" provision in the
FCRA takes hold not when an employer *makes* the decision to take adverse action,
but rather when it *carries out* that decision.  But here, the gravamen of
Defendants' argument is that *no* decision had been made as to the status of
Burghy's employment, rather than acknowledging the decision, but arguing it had
not yet been implemented, as was the case in Obabueki.

agree that Kevin Round had indicated he would speak with his superiors at

ClubCorp, but Plaintiff understood that it was with the goal of getting her position

back, while Defendants contend it was to find a way around the otherwise

unavoidable need to terminate her position at some future time.

It is also uncontroverted that Plaintiff continued to be paid after the meeting,

but again, Plaintiff's and Defendants' characterization of this fact differs.

Defendants argue that, after the meeting, Plaintiff was simply told to take the rest

of the week off, the ultimate status of her employment still undetermined, and that

she continued to be paid during her week off leading up to her eventual

termination.  Doc. #18 at 15.  Plaintiff was then paid for another week after

January 23rd, until she began receiving unemployment, which defendants

characterize as a severance payment.  Id.  Conversely, Plaintiff asserts that she

was told she was fired in the meeting, and that she collected two weeks worth of

salary thereafter as a severance.  Doc. #17 at 49.

The divergent interpretations of events in the relevant time frame reveal a

genuine factual dispute.  A jury that believed Plaintiff's recitation of the events

from January 15 to January 23, especially her account of what transpired in the

meeting of January 16, would be entitled to find in her favor.

Accordingly, Defendants' Motion for Summary Judgment as it relates to

Plaintiff's claim under § 15 U.S.C. § 1681b(b)(3)(A) is overruled.

IV. <u>Violation of 15 U.S.C. § 1681b(b)(1)(A): Obtaining a Consumer Report Under</u>
<u>False Pretenses</u>

Count III of Plaintiff's Complaint alleges that Dayton Racquet Club is liable for obtaining her credit report from a consumer reporting agency under false pretenses. Plaintiff's argument is that the two alleged violations of § 1681b, already discussed, demonstrate that Dayton Racquet Club "automatically violated 15 U.S.C. § 1681b(b)(1)(A)." Doc. #20 at 9. This claim is fraught with problems, both structurally and on the merits. As an initial consideration, § 1681b(b)(1)(A) does not set out a cause of action for obtaining a credit report under false pretenses. The FCRA does provide for such a claim, but it is actually found in §1681n(a)(1)(B). Although Plaintiff's theory as to how § 1681b(b)(1)(A) and § 1681n(a)(1)(B) coalesce is somewhat murky, it is clear that she has not set out a tenable cause of action under either.

In presenting her false pretenses argument, Plaintiff first refers to § 1681b(b)(1)(A). The pertinent language of § 1681b is thus:

> (b) Conditions for furnishing and using consumer reports for employment purposes.
> (1) Certification from user. A consumer reporting agency may furnish a consumer report for employment purposes only if—
> (A) the person who obtains such report from the agency certifies to the agency that—
> (i) the person has complied with paragraph (2) with respect to the consumer report, and the person will comply with paragraph (3) with respect to the consumer report if paragraph (3) becomes applicable . . .

In this context, compliance with paragraph (2) means that the consumer must be provided the disclosure that a consumer report is being obtained for employment

purposes, and authorize the employer to obtain a report (§ 1681b(b)(2)(A)).

Compliance with paragraph (3) means that the consumer must be provided with a

copy of her report and statement of rights under the FCRA before any adverse

action is taken (§ 1681b(b)(3)(A)). Of course, these same issues formed the basis

of Plaintiff's first and second claims, which the Court has already discussed.

Plaintiff argues that "[s]hould the Court find that Defendants violated

15 U.S.C. § 1681b(b)(2)(A) and/or 15 U.S.C. § 1681b(b)(3)(A), then it follows

that Defendants automatically violated 15 U.S.C. § 1681b(b)(1)(A)." Doc. #20 at

9. This is confusing, though, because 15 U.S.C. § 1681b(b)(1)(A) is a requirement

the FCRA places on employers; it is not itself a cause of action. The cause of

action to which Plaintiff refers, obtaining a consumer report under false pretenses,

appears in § 1681n ("Civil liability for willful noncompliance") which reads:

> (a) In general. Any person who *willfully* fails to comply with *any requirement* imposed under this title (15 USCS §§ 1681 et seq.) with respect to any consumer is liable to that consumer in an amount equal to the sum of—
> (1)(A) any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000; *or*
> (B) *in the case of liability of a natural person for obtaining a consumer report under false pretenses or knowingly without a permissible purpose*, actual damages sustained by the consumer as a result of the failure or $1,000 whichever is greater . . .

(emphasis added). The false pretenses cause of action in the FCRA was the result

of Congressional amendments to the Act in 1996, which codified earlier holdings

from the Sixth Circuit and other courts:

> At the time of the events giving rise to this case, § 1681n provided a civil cause of action against "any consumer reporting agency or user of information which willfully fails to comply with any requirement under [the FCRA]." In Kennedy v. Border City Sav. & Loan Ass'n, 747 F.2d 367 (6th

- 29 -

Cir. 1984), this court concluded that a violation of § 1681q—which criminalizes the act of knowingly and willfully obtaining information under false pretenses from a consumer reporting agency—constitutes a basis for civil liability under § 1681n. In 1996, Congress amended § 1681n to expressly provide a cause of action against a party for "obtaining a consumer report under false pretenses or knowingly without a permissible purpose."

Duncan v. Handmaker, 149 F.3d 424, 426 n.1 (6th Cir. 1998).

Although Plaintiff does not specifically identify § 1681n(a)(1)(B) in her memorandum, she does utilize the identical language in alleging that Dayton Racquet Club "obtained [her] consumer report under false pretenses or knowingly without a permissible purpose." Doc. #20 at 9. This makes her argument confusing, but it appears that she acknowledges that § 1681n(a)(1)(B) gives rise to the cause of action she is asserting, while her theory of liability is that Defendants have not complied with § 1681b(b)(1)(A). That is, "[b]y failing to comply with these two sections [to which § 1681b(b)(1)(A) refers], Defendants made false statements to a consumer reporting agency to obtain Ms. Burghy's credit reports." Id. Section 1681b(b)(1)(A) appears to be superfluous, then, because it simply invokes other FCRA violations that Plaintiff has already argued.[11] Regardless, Plaintiff's argument is unsound for two reasons.

--------

[11] It seems that Plaintiff acknowledges as much, as the topic heading for her argument makes no mention of § 1681b(b)(1)(A) and reads instead:

c. Defendants obtained Plaintiffs [sic] credit filed [sic] from a consumer reporting agency under false pretenses and/or without a permissible purpose because compliance with 15 U.S.C. § 1681b(b)(2)(A) and 15 U.S.C. § 1681b(b)(3)(A) *is a prerequisite* to having a permissible purpose to obtain a consumer report for employment purposes.

Doc. #20 at 9 (emphasis added).

First, she does not identify any "natural persons" as defendants, and this is necessary to assert a claim of false pretenses. While "person" generally means an individual or a corporate entity under the FCRA, see 15 U.S.C. § 1681a(b), a cause of action for obtaining a consumer report under false pretenses or knowingly without a permissible purpose can only lie against a "natural person." 15 U.S.C. § 1681n(a)(1)(B). By distinguishing between the liability of "persons" and "natural persons," the FCRA indicates that a false pretenses claim cannot be asserted against a corporate entity. See, e.g., Hunt v. Experian Info. Solutions, 2006 U.S. Dist. LEXIS 62516 at *4 (D. Neb. 2006) ("'natural persons' [] does not include partnerships, corporations, trusts, estates coops, associations or government entities.") (applying the FCRA); Benjamin v. Coker, 2008 U.S. Dist. LEXIS 42275 (D. Ariz. 2008) (evaluating a claim of false pretenses under the FCRA asserted against two individuals, an attorney and a private investigator). Burghy has only identified Dayton Racquet Club and ClubCorp, its parent corporation, as defendants. Since she does not assert any violations of the FCRA on the part of those corporations' individual owners or managers, by definition, there can be no cause of action for obtaining a credit report under false pretenses.

Second, Plaintiff's theory of "automatic" liability cannot be aligned with the cause of action she is asserting. Section 1681n(a) announces that any person (natural or otherwise) is liable for *willfully* failing to comply with any FCRA requirement, while § 1681n(a)(1)(B) provides liability for *knowingly* obtaining a consumer report without a permissible purpose or under false pretenses. Additionally, § 1681o creates a cause of action against anyone who *negligently* violates any provision of the FCRA. Plaintiff's Complaint sets out her false pretenses claim by stating that "Defendants' conduct was *willful* rendering

Defendants jointly and severally liable . . . pursuant to 15 U.S.C. § 1681n.  In the alternative, Defendants' conduct was *negligent* . . . under 15 U.S.C. § 1681o."  Doc. #1 at ¶ 34 (emphasis added).  But, as the Court has indicated, Plaintiff's memorandum abandons both of these positions to argue, instead, that a case of automatic liability for obtaining her credit report under false pretenses arrives on the back of her other two FCRA claims.  While the allegations of her complaint were likely insufficient from the start (because a false pretenses claim requires a "knowing" mental state), there is simply no way to read the FCRA that is consistent with Plaintiff's new theory of "automatic" liability.

Accordingly, Defendants' Motion for Summary Judgment as to Plaintiff's claim under § 1681b(b)(1)(A) is sustained.


V. Negligence and Intentional Infliction of Emotional Distress

In her Response to the Defendant's Motion for Summary Judgment, Plaintiff explicitly abandons her claim of negligence,[12] (Doc. #20 at 9), and all but abandons her claim for intentional infliction of emotional distress, remarking only that: "Plaintiff acknowledges that establishing a cause of action for intentional infliction of emotional distress under Ohio law is difficult." Id. at 9-10.

---

[12]In her Complaint, Plaintiff entitles her final cause of action "Count V – Negligence," Doc. #1 at 6, but in her Response, she states: "Plaintiff acknowledges that she cannot establish a cause of action for *negligent infliction of emotional distress* under Ohio law."  Doc. #20 at 9 (emphasis added).  While Plaintiff presumably meant to concede "negligence," rather than "negligent infliction of emotional distress," in any case, she did not come forward with evidence in support of either position or address any of Defendants' arguments. Thus, summary judgment is appropriate for Count V of her complaint.  See Celotex Corp., 477 U.S. at 324.

The Ohio Supreme Court has set out the requirements for a claim of intentional infliction of emotional distress:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Yeager v. Local Union 20, 6 Ohio St. 3d 369, 374-75, 453 N.E.2d 666, 671-72 (1983) (citation omitted). Nothing in this case approaches such a high bar. Plaintiff's claim herein, like her allegation that her consumer report was obtained under false pretenses, simply duplicates her first two claims under the FCRA. Assuming arguendo, that Plaintiff has established each and every element of those underlying claims, nothing further is offered to suggest that such a situation is outrageous by definition or in this particular case. Thus, no issue of material fact has been raised, and Defendants are entitled to judgment as a matter of law.

Accordingly, the Defendants' Motion for Summary Judgment as it relates to Counts IV and V of the Complaint is sustained.

VI. Conclusion

As a result of the Court's rulings herein, the Defendant's Motion for Summary Judgment is sustained as it relates to the first, third, fourth and fifth claims of Plaintiff's Complaint. The Defendant's Motion is overruled only as it relates to Plaintiff's second claim, that Dayton Racquet Club took adverse action against her before providing her with a copy of her consumer report and a

statement of her rights under the FCRA, in violation of 15 U.S.C.

§ 1681b(b)(3)(A).  This is the only matter that remains to be resolved at trial.


Counsel of Record will note that a telephone conference call will be

convened, between the Court and counsel, at 8:45 A.M. on Thursday, March 4,

2010, to determine final procedures to follow in this litigation.



February 26, 2010

                                        /s/ Walter Herbert Rice
                                    _____
                                        WALTER HERBERT RICE, JUDGE
                                        UNITED STATES DISTRICT COURT

Copies to:

Counsel of Record.